T.C. Memo. 2004-195


UNITED STATES TAX COURT


GARWOOD IRRIGATION COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1459-03.                    Filed August 30, 2004.


<u>Donald F. Wood</u>, <u>Benjamin M. Leff</u>, and <u>Karl S. Stern</u>, for
petitioner.

<u>Richard T. Cummings</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GOEKE, <u>Judge</u>:  Respondent determined a deficiency of
$15,819,650 in petitioner's 1999 Federal income tax.  The issue
for decision is the value of petitioner's primary asset, the
right to divert 168,000 acre feet of water from the Colorado

River, upon petitioner's election to be treated as an S corporation effective January 1, 1997.

Our decision relies on the record, which is sufficient in this case to make a decision based on a preponderance of the evidence. We do not rely on the burden of proof. In addition, there is cogent proof in the record that the value of petitioner's water right was less than that stated on petitioner's 1999 Federal income tax return. Our decision that the value was lower than that stated on petitioner's return is based on the factual circumstances surrounding an arm's-length sale of a portion of petitioner's water right to the city of Corpus Christi. We conclude that as of January 1, 1997, the value of petitioner's water right was $22,532,519.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner's principal place of business was in the city of Garwood, Texas.

Petitioner has been in the irrigation business in Texas since 1900. Petitioner existed as an S corporation from 1948 until 1978, when William K. Lehrer, one of petitioner's shareholders, died. At his death, William K. Lehrer's shares in petitioner passed to two trusts. At that time and until 1996,

trusts were ineligible to be S corporation shareholders.  As a result, petitioner operated as a C corporation from 1978 until 1997.  William N. Lehrer (Mr. Lehrer), who is William K. Lehrer's son, was petitioner's chairman of the board and chief executive officer on the valuation date and for several years before the valuation date.

On March 19, 1997, petitioner filed Form 2553, Election By A Small Business Corporation, to elect to be an S corporation under section 1362[1] (the election).  The election was effective January 1, 1997.  At the time of the election, petitioner's primary asset was the right to divert 168,000 acre feet[2] of water from the Colorado River at a specified diversion point near Garwood, Texas.  Petitioner also held an investment portfolio at the time of the election, the value of which has been agreed upon by the parties.

On January 7 and 8, 1999, petitioner sold its water right and related assets to the Lower Colorado River Authority (LCRA) and the city of Corpus Christi, Texas (Corpus Christi).  Petitioner timely filed Form 1120S, U.S. Income Tax Return for an

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]An acre foot of water is the amount of water necessary to cover an acre of land 1 foot deep and is equal to approximately 326,000 gallons.

S Corporation on September 16, 2000 (the 1999 return). The 1999 return reported a built-in gains tax of $9,636,736 on the sale of petitioner's water right. The built-in gains tax amount reported by petitioner was based on a valuation of $31,410,000 as of January 1, 1997 (valuation date) for the water right and the investment portfolio.

Respondent determined a deficiency in petitioner's 1999 Federal income tax of $15,819,650, based on a valuation of $76,609,000 for the water right and the investment portfolio.

1. Petitioner's Irrigation Business

The State of Texas owns the water in its public waterways. The right to divert and use or sell water from a waterway is known as a "water right". The Texas Commission on Environmental Quality, formerly known as the Texas Natural Resources Conservation Commission (hereinafter, the TNRCC), is a State agency that regulates the water rights in Texas and controls the transfer and use of such rights. The TNRCC formally recognized a water right by issuing to the holder a Certificate of Adjudication, which contained the limits of that right, its priority date, and any special or unique conditions associated with its use.

On June 28, 1989, the TNRCC formally recognized petitioner's water right and issued to it Certificate of Adjudication No. 14-5434 (certificate). Petitioner's certificate allowed it to

withdraw 168,000 acre feet of water per year from the Colorado River for irrigation of up to 32,000 acres of land within its service area.  The Colorado River involved in this case begins in southeastern New Mexico and flows approximately 600 miles from northwestern Texas to southeastern Texas and empties into the Matagorda Bay and the Gulf of Mexico.  For water allocation purposes, Texas is divided into areas of watershed from its rivers, called river basins.  The Colorado River Basin is the third largest river basin in Texas.  Petitioner's service area was located in the lower Colorado River Basin, in Colorado and Wharton counties, Texas.

Petitioner's certificate gave it a priority date of November 1, 1900.  In the event of a shortage of water, priority dates determine which rights holders will receive their allocated share of the water that is available.  Holders of water rights with later, or junior, priority dates must let water flow past them until a senior holder receives the full amount of water authorized by its certificate.  At the time the certificate was issued and at the valuation date, petitioner's priority date was the most senior in the Colorado River Basin.

As of the valuation date, petitioner's water right had been used only for irrigation for rice farming.  Petitioner's only customers were rice farmers, and petitioner's service of its rice-farming customers had never required petitioner to use all

of the water allotted by its certificate.  In the several years leading up to the valuation date, an average of 100,000 acre feet per year were used for irrigation purposes.  In each year, the difference between the amount of water petitioner was entitled to withdraw (168,000 acre feet) and the amount of water needed to serve its irrigation customers (100,000 acre feet) was approximately 68,000 acre feet.  The 68,000 acre feet of extra water flowed unused past petitioner's diversion point and into the Matagorda Bay every year.

2.    Events Before the Valuation Date

A.    Regulatory Climate

The TNRCC regulated the use, transfer, and management of Texas water, and no transfer of water rights in Texas could occur without the TNRCC's approval.  If a transfer would result in the subject water being put to a different type of use than that listed on its certificate, or the movement of the subject water to a different area or basin, the seller was required to apply to the TNRCC to amend its certificate to reflect the new use or location.  As of the valuation date, the TNRCC had broad discretion to grant or deny amendments, and evaluated each application based on six criteria:  Availability of additional requested water, environmental impacts, injury to existing rights, beneficial use (including need), public welfare, and water conservation.  The TNRCC also conducted technical reviews

of hydrology, environmental factors, and water conservation.  If a change in use would cause harm to other in-basin users, the requested amendment could be denied.  A request for a transfer of water to another basin, or an "interbasin transfer", required additional consideration of the benefits and detriments to each basin.  In addition, when an application was made, the TNRCC would notify interested persons and give them an opportunity to present evidence and be heard on the matter.  If an interested party objected to the TNRCC's determination, it had the option of filing suit in a district court of Travis County, Texas, for review of the TNRCC's determination.  The district court's decision was appealable to the Texas Courts of Appeal and the Texas Supreme Court.  Around the valuation date, the TNRCC generally granted or denied uncontested applications within 12 to 18 months of their filing.  The amendment process for contested applications generally took between 2 and 5 years at the TNRCC level excluding any time spent in the Texas courts.

B.  Corpus Christi Transaction

In 1992, petitioner granted the city of Corpus Christi an option to purchase the right to a 35,000 acre-foot portion of petitioner's water right for $400 per acre foot.  The agreement was for 2 years and required Corpus Christi to pay petitioner $20,000 per month to keep the option open.  The monthly payments would be credited to the purchase price if Corpus Christi

exercised the option. On March 18, 1993, the TNRCC granted an amendment to petitioner's certificate, authorizing the change of use for the 35,000 acre feet subject to the option from agricultural to municipal and industrial use. In February 1994, the option agreement was amended to extend the period in which Corpus Christi could exercise the option for 2 additional years, to increase the monthly payments to $25,000, and to increase the option payment to $450 per acre foot. In November 1996, Corpus Christi notified petitioner that it intended to exercise the option. Upon notification of Corpus Christi's exercise, the option agreement required petitioner to obtain amendments to its certificate from the TNRCC authorizing an interbasin transfer of the 35,000 acre-foot portion of petitioner's water to various other basins for Corpus Christi's use. The option agreement provided that Corpus Christi could either close the sale or withdraw from the transaction upon petitioner's acquisition of the amendment to its certificate.

As of the valuation date, petitioner had not yet submitted an application for an amendment authorizing the interbasin transfer. However, the LCRA had made it known by the valuation date that it planned to oppose the Corpus Christi transaction. In fact, at that time the LCRA had a policy of vigorously opposing any transfer of water out of the Colorado River Basin and was a politically influential organization. Its mission was

to steward water resources and protect users in the Colorado River Basin.  The transfer of petitioner's water out of the Colorado River Basin would have diminished the amount of water consistently available for future use within the Colorado River Basin.

The city of Austin (Austin), the Colorado River Municipal Water District, and property owners around five reservoirs created and owned by the LCRA also expressed their intention to oppose the granting of an amendment to petitioner's certificate necessary for the Corpus Christi transaction.  Nevertheless, the LCRA was not confident that it would be successful in blocking the transfer to Corpus Christi.

C.    Anticipation of the 1997 Legislative Session

Texas experienced a severe drought in the summer of 1996, which was alleviated as of the valuation date.  As a result of the drought, on August 30, 1996, the TNRCC issued a report recommending legislative guidance on the criteria to be used in making determinations regarding applications for interbasin transfers.  In addition, other interested parties were lobbying the Texas legislature to make the rules regarding interbasin transfers both more and less restrictive.  The interbasin transfer issue was expected to be considered at the 1997 legislative session, which was to convene on January 14, 1997. Within the Texas legislature there was support for expanding the

ability to move water throughout the State to spur growth. There was also opposition to interbasin transfers because of the potential for restraint of economic growth within certain areas. As a result, before the 1997 session began, it was unknown what the legislature would do regarding water rights.

D.    Petitioner's Unused Water

As of the valuation date, 68,000 acre feet of water flowed unused past petitioner's diversion point into the Matagorda Bay each year and did not generate any income for petitioner. A 35,000 acre-foot portion of this was involved in the Corpus Christi transaction. This left 33,000 acre feet of petitioner's water right unused. Under petitioner's certificate, the 33,000 acre feet of unused water, as well as the 100,000 acre feet of irrigation water, were authorized to be used only for agricultural use, and only in petitioner's service area. There was a reasonable probability that at some point in the future, the unused water could be converted to municipal or industrial use, inside or outside the Colorado River Basin, which would make the water more valuable, but such a conversion would have required time, money, and regulatory approval. A transfer of petitioner's unused water out of the Colorado River Basin, after the transfer of 35,000 acre feet to Corpus Christi, would have increased the likelihood that inbasin users would be impaired and that inbasin development would be impeded. If petitioner applied

for a transfer of the unused water out of the Colorado River Basin, it would likely have faced greater regulatory hurdles than it faced with the Corpus Christi transaction.

No prospective buyers, other than Corpus Christi, had made an offer or was actively pursuing the purchase of any portion of petitioner's water right as of the valuation date. Austin is located in the Colorado River Basin and might have been a potential customer for petitioner's water, but Austin had a long-standing agreement with the LCRA that entitled it to free water. Austin did not predict that it would exceed its allotted free water until at least 2030. Similarly, the city of San Antonio had discussions with petitioner in 1991 about purchasing a portion of its water right, but those discussions had ended by the end of 1991. Neither city was actively pursuing a purchase of any part of petitioner's water right as of the valuation date.

Petitioner's shareholders had discussions with the LCRA in 1967, 1972, and 1992 regarding the possibility of the LCRA's purchase of petitioner's water right. None of these discussions resulted in a sale, and the LCRA did not even make an offer during the most recent discussions in 1992. The LCRA had expressed interest in purchasing petitioner's entire water right. Mr. Lehrer was willing to sell only a portion of the water right. As of the valuation date, the LCRA had not made any recent offers or initiated any serious discussions regarding the sale of

petitioner's water right.  At the beginning of 1997, it opposed any transfer of petitioner's water outside the Colorado River Basin, including the proposed sale to Corpus Christi.

3.   Events After the Valuation Date

     A.   The 1997 Legislative Session

During the 1997 Texas legislative session, legislators and interest groups with opposing interests rewrote the laws regulating water planning and usage in Texas.  The result of this collaboration was Senate Bill 1 (SB1).  SB1 included an amendment known as the Junior Water Rights Provision.  Under the amendment, the water rights involved in any interbasin transfer approved under the new law would lose their priority date and be assigned the date of the transfer as a new priority date.  SB1 became effective September 1, 1997.  All interbasin transfers for which applications were made before March 1, 1997, including petitioner's application for an interbasin transfer to Corpus Christi, were exempted from the amendment.

A loss of priority date would be significant to petitioner because of the nature of its water right.  Petitioner's water right was a run-of-the-river right.  A run-of-the-river right entitles the holder to divert water only if the flow is available on the day the holder needs to use it, and compels upstream holders of water rights with junior priority dates to allow available water to flow past them, without diverting or storing

it, in order to meet the senior right holder's need.   A holder of a run-of-the-river right does not have the right to call water that has been stored in a reservoir upstream, despite a junior priority date of the upstream holder.  As a result, a run-of-the-river right is not as dependable as rights to stored water during a drought and is less valuable.  Petitioner's certificate allowed it to store only 86 acre feet of water, which was sufficient to enable its intake pumps to function properly at normal stream flows.  Consequently, petitioner's early priority date was important in that it determined the availability of water to petitioner in times of drought.

On August 29, 1997, petitioner filed an application with the TNRCC for the right to change the use of and to transfer out of the Colorado River Basin the 133,000 acre-foot portion of its water right not being sold to Corpus Christi.  The requested amendment would allow petitioner to sell all or a part of its water right for municipal, industrial, or commercial purposes outside of the Colorado River Basin.  Petitioner made the August 27, 1997, application in order to preserve an argument that its remaining water would be exempt from the Junior Water Rights Provision of SB1 because the application was filed before the effective date of SB1 (September 1, 1997).  The argument was supported by letters from Texas State senators.  Since the

passage of SB1, there have been no major interbasin transfers that were subject to the Junior Water Rights Provision.

B.    The Corpus Christi Transaction

On January 30, 1997, petitioner filed an application with the TNRCC for an amendment to its certificate approving an interbasin transfer of a 35,000 acre-foot portion of petitioner's water right to Corpus Christi.  In September 1997, the TNRCC gave public notice of the filing of petitioner's application.  Fifteen parties, including the LCRA and Austin, filed protests to the proposed transfer to Corpus Christi.  The LCRA did not hold a public hearing regarding petitioner's application.  As of the end of 1997, petitioner's application was still pending with the TNRCC.

C.    LCRA's Purchase of Petitioner's Water Right

At the valuation date, the LCRA showed no interest in acquiring petitioner's water.  The LCRA's interest was protected if it could effectively block the approval of an interbasin transfer of the water by petitioner.  In late 1997, after the enactment of SB1, the LCRA began to analyze a possible acquisition of the remaining 133,000 acre-foot portion of petitioner's water right, as well as petitioner's dam, pumps, canals, and other irrigation assets.  On December 12, 1997, Mark Rose, the general manager of the LCRA, met with Mr. Lehrer to discuss a possible acquisition of petitioner's assets.  On

February 18, 1998, Mr. Lehrer and Mr. Rose signed a letter agreement in which the LCRA agreed to purchase the portion of petitioner's water right not involved in the Corpus Christi transaction and petitioner's irrigation assets for $75 million. The purchase price was proposed by Mr. Lehrer and accepted by the LCRA without negotiation or counteroffer. As a condition to the sale, the LCRA agreed to withdraw its opposition to the Corpus Christi transaction and to assist petitioner in obtaining approval for the Corpus Christi transaction from the TNRCC. Petitioner had the right to cancel the sale if the TNRCC did not approve the Corpus Christi transaction. Petitioner also agreed not to negotiate with anyone else during the pendency of the sale to the LCRA.

On July 20, 1998, petitioner and the LCRA signed a purchase agreement for the sale of the remaining 133,000 acre-foot portion of petitioner's water right. On July 22, 1998, petitioner filed an application with the TNRCC for authorization to use the 133,000 acre-foot portion of its water for municipal or industrial purposes, but only to the extent the water was not needed within petitioner's service area for irrigation. The application also requested an expansion of the service area in which petitioner's water right could be used, to four additional counties within the Colorado River Basin, but again, only to the extent the water was not needed within petitioner's service area

for irrigation.  As part of its commitment to assist petitioner in securing approval for the Corpus Christi transaction, the LCRA tried to induce opponents to withdraw their protests.  Some opponents did withdraw their protests.

In 1998, the LCRA had discussions with Austin regarding the possibility of a long-term water supply contract that would substantially increase Austin's water supply in the future.  On September 17, 1998, Austin and the LCRA signed an agreement that assured Austin adequate future water supply.  On the same day, after reaching this agreement, Austin withdrew its protest to the Corpus Christi transaction.  The 1998 discussions marked the first time Austin clearly signified its interest in being a customer for petitioner's water, and the LCRA had no assurance that Austin would sign the water supply agreement with the LCRA until the agreement was executed.

On October 7, 1998, effective as of October 3, 1998, the TNRCC approved petitioner's applications for the Corpus Christi and LCRA transactions.  On January 7, 1999, the Corpus Christi transaction for 35,000 acre feet closed, and on January 8, 1999, the LCRA transaction for the remaining 133,000 acre feet closed.

On its books and balance sheet, the LCRA was required to record the water right at fair market value by generally accepted accounting principles.  The LCRA had informally agreed to the purchase price before knowing what the fair market value of the

assets was. It began examining the value of the remaining water right in December 1997. After the purchase, the LCRA recorded $75 million as the fair market value of the assets it purchased from petitioner and booked the entire amount to the water right. The LCRA justified this conclusion based on the sales prices of other water rights, inflation adjusted prices it had paid for water rights in the past, and the cost of building a new reservoir with capacity equivalent to petitioner's remaining water.

After the proposed sale to the LCRA had become public, the city of San Antonio approached petitioner and inquired whether petitioner would entertain a competing offer from San Antonio for its water right. Petitioner declined and indicated that it did not want to start a bidding war. In 2002, the LCRA entered into a long-term water supply agreement with San Antonio, agreeing to supply San Antonio 150,000 acre feet of water for 80 years. San Antonio is outside the Colorado River Basin.

OPINION

I. Petitioner's Conversion From C Corporation to S Corporation

The parties do not dispute that petitioner is subject to tax on the built-in capital gain on its assets as of January 1, 1997. We briefly discuss the law that subjects petitioner to such tax.

Subchapter S status entitles small, eligible corporations to be taxed like partnerships, avoiding the corporate-level taxation

to which C corporations are subject.  Such an eligible corporation may elect, under the provisions of section 1362, to be an S corporation with the consent of all its shareholders. Section 1374 was enacted in 1986 to prevent corporations from electing to be S corporations for the purpose of avoiding tax on built-in gains.  Tax Reform Act of 1986, Pub. L. 99-514, sec. 633(d)(8), 100 Stat. 2280.  Section 1374 requires that if a corporation holds appreciated capital assets before it makes an election under section 1362, and any of the appreciated capital assets are sold within 10 years of the election, it will be subject to corporate-level tax on the amount the corporation realizes over its basis in the sold assets (built-in gain).  The corporation is taxed only on the built-in gain present on the effective date of the election; any gain after the effective date is passed through to the corporation's shareholders.  Therefore, if an asset with built-in gain has uncertain value, the proper valuation date for the asset is the effective date of the corporation's election.

Petitioner agrees that because it elected to be an S corporation as of January 1, 1997, it will be taxed on the built-in gain on its assets as of that date.  The parties dispute the value of petitioner's primary asset, the water right, on that date.

II.  Valuation Methodology

At trial, petitioner presented the testimony of Terry Lloyd, C.P.A., C.F.A., as an expert valuation witness.  Mr. Lloyd prepared an expert witness report in accordance with Rule 143. The record also contains the expert report of John E. Camp, C.P.A./A.B.V., C.F.A., of Ferguson, Camp & Henry, whose report provided the valuation used in the preparation of petitioner's 1999 Federal income tax return (1999 return).  In addition, in evidence is a draft expert report by Jonathan E. Kemmerer, C.P.A., dated June 5, 1996, and a report by James Kowis, P.E., of James Kowis Consulting, dated November 10, 2003.  Mr. Kemmerer's expert report was submitted in draft form, and is of limited use to reach a final valuation conclusion.

Respondent presented the testimony of Gregory E. Scheig, C.F.A., C.P.A., of CBIZ Valuation Group, Inc., as an expert valuation witness.  Mr. Scheig prepared an expert witness report in accordance with Rule 143.  Mr. Lloyd, Mr. Camp, and Mr. Scheig in their respective expert reports valued petitioner's water right in separate components: (1) The estimated 100,000 acre-foot portion of petitioner's water used for irrigation, (2) the 35,000 acre-foot portion of petitioner's water involved in the Corpus Christi transaction, and (3) the estimated 33,000 acre-foot portion of petitioner's water that was neither used for irrigation nor involved in the Corpus Christi transaction.  Mr.

Scheig and Mr. Camp also valued a portion of the irrigation component that they believed might become available at a later date for other, higher value uses as irrigation use declined.

While expert opinions may assist in evaluating a claim, we are not bound by these opinions and may reach a decision based on our own analysis of all the evidence in the record.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  Where experts offer conflicting estimates of fair market value, we must weigh each estimate by analyzing the factors they used to arrive at their conclusions.  Casey v. Commissioner, 38 T.C. 357, 381 (1962).  This Court may accept or reject the opinion of an expert in its entirety, or we may be selective in the use of any portion.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998); Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980).  Mr. Lloyd concluded that the value of the water right was $10.7 million on the valuation date.  Mr. Camp concluded that the value of the water right was $29,397,000, and petitioner reported this value on its 1999 return.  Mr. Scheig concluded that the value of the water right was $45,809,384 on the valuation date.  Mr. Scheig's valuation represents a significant departure from respondent's position in the notice of deficiency, in which respondent stated that petitioner's assets were worth $76,609,000

on the valuation date.  Respondent's departure from his position in the notice of deficiency prompted petitioner to file a motion to shift the burden of proof.  As stated above, our decision does not rely on the burden of proof, and petitioner's motion was denied as moot.

III.  Cogent Proof That Petitioner's Return Was Incorrect

Positions taken by a taxpayer in a tax return are treated as admissions and cannot be overcome without cogent proof that they are erroneous.  Mendes v. Commissioner, 121 T.C. 308, 312 (2003); Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).  On its 1999 return, petitioner reported a value of $29,397,000 for its water right.  In its petition, petitioner contends that the fair market value of its water right is $10.7 million.  In order to prevail in showing that the value of the water right is less than that reported on its return, petitioner must present cogent evidence that its reported values were wrong.  Estate of Hall v. Commissioner, supra at 338.

IV. Valuation

The central dispute between the parties in this case focuses on the foreseeability of events that occurred after the valuation date.  Events subsequent to the date of valuation are not generally considered in determining an asset's fair market value, except to the extent that they were reasonably foreseeable as of the date of valuation.  Estate of Jung v. Commissioner, 101 T.C.

412, 431 (1993); Estate of Gilford v. Commissioner, 88 T.C. 38,
52 (1987); Hess v. Commissioner, T.C. Memo. 2003-251.  These
events can be helpful in valuing assets if they shed light on the
expectations that a hypothetical willing buyer and seller might
have reasonably entertained at the valuation date.  Estate of
Bailey v. Commissioner, T.C. Memo. 2002-152.  Petitioner's expert
at trial, Mr. Lloyd, contended that as of the valuation date, the
purchase of petitioner's water right by the LCRA was
unforeseeable to the hypothetical willing seller and buyer.
Respondent contends that it was foreseeable that the LCRA would
eventually purchase the water right; the question was simply when
and at what price.  Respondent also asks us to accept as evidence
of his valuation the facts surrounding the closings of the Corpus
Christi transaction and the LCRA's purchase of the water right in
January 1999.  See, e.g., Estate of Jung v. Commissioner, supra
at 431.  We shall examine the factors affecting each component of
the water right to determine to what extent the subsequent events
were foreseeable.  Set forth below is a time line of the events
relevant to our determination in this case.

| Event | Date |
|---|---|
| LCRA discusses purchase of water right with petitioner | 1967, 1972 |
| San Antonio and petitioner discuss a possible purchase of a portion of petitioner's water right | 1991 |

| Event | Date |
|-------|------|
| LCRA discusses purchase of water right with Mr. Lehrer | 1992 |
| Corpus Christi option agreement is executed | 1992 |
| TNRCC approves Corpus Christi change of use amendment | Mar. 18, 1993 |
| Corpus Christi option agreement is amended | Feb. 1994 |
| Texas experiences drought | Summer 1996 |
| TNRCC requests legislative guidance regarding interbasin transfers | Aug. 30, 1996 |
| Corpus Christi exercises its option | Nov. 26, 1996 |
| Petitioner elects S status | Jan. 1, 1997 |
| 1997 Texas legislature convenes | Jan. 14, 1997 |
| Petitioner applies for Corpus Christi interbasin amendment | Jan. 30, 1997 |
| Grandfather date for interbasin transfers under Senate Bill 1 | Mar. 1, 1997 |
| Petitioner files application for interbasin transfer and change of use for its remaining water | Aug. 27, 1997 |
| Effective date of Senate Bill 1 | Sept. 1, 1997 |
| LCRA begins to analyze purchase of petitioner's water | Late 1997 |
| Mr. Rose of LCRA meets with Mr. Lehrer | Dec. 12, 1997 |

| Event | Date |
|-------|------|
| LCRA first has discussions with Austin regarding long-term water supply contract | 1998 |
| San Antonio approaches petitioner to discuss a competing offer | 1998 |
| Petitioner and LCRA sign letter agreement for purchase | Feb. 18, 1998 |
| Public announcement of LCRA purchase | Feb. 19, 1998 |
| Petitioner and LCRA sign purchase agreement | July 20, 1998 |
| Petitioner applies to TNRCC for amendment for change of use and expanded service area for transfer to LCRA | July 22, 1998 |
| LCRA and Austin reach water supply agreement | Sept. 17, 1998 |
| TNRCC approves petitioner's Corpus Christi and LCRA applications | Oct. 7, 1998 |
| Corpus Christi transaction closes | Jan. 7, 1999 |
| LCRA transaction closes | Jan. 8, 1999 |
| LCRA and San Antonio reach 80 year water supply agreement | 2002 |

A.   Irrigation Component

At the valuation date, petitioner's only customers for its water right were rice farmers.  The rice farming customers used approximately 100,000 acre feet of water each year for irrigation purposes.  The sale of this irrigation water produced revenue to petitioner and was expected to continue to produce income in the

future.  The projected irrigation income was foreseeable as of the valuation date and must be included in our valuation of petitioner's water right.

Petitioner's average net annual income from irrigation sales over the 5 years before the valuation date was $354,837.  As of the valuation date, a decline in rice farming in Texas was expected over the next 50 years as a result of various hardships imposed by economic and environmental climates.  As a result, the demand for irrigation water in petitioner's service area was expected to decline over 50 years.  The experts differed on the expected rate of decline.  Mr. Scheig stated that the most likely rate of decline was .4 percent per year, but he also factored in a 25-percent chance of a 3-percent rate of decline and a 25-percent chance of a 100-percent rate of decline.  We do not give any weight to Mr. Scheig's third scenario (a 100-percent decline in irrigation use) because, based on the reports and testimony of the experts in this case, it is obvious that the likelihood of a conversion of all of petitioner's irrigation water to other uses was minuscule.  Rice farmers were very protective of the water they used.  The use of petitioner's water for irrigation purposes benefited the inbasin users because irrigation returned more water to the Colorado River Basin than other uses (especially uses requiring interbasin transfers, which returned no water to the basin).  Rice farmers in Texas also had significant influence

on the legislators who, in turn, had influence over the TNRCC. From a political and regulatory standpoint, the sale of 100 percent of petitioner's irrigation water was too remote to be considered in this analysis.

Mr. Lloyd did not consider any decline in his analysis. Mr. Camp predicted that demand for irrigation water would decrease by 20 percent and calculated this decline over 25 years. On the basis of the parties' reports and testimony, we find it was reasonably foreseeable on January 1, 1997, that the demand for irrigation water would decline 20 percent over the first 10 years. We also find that it was foreseeable on the valuation date that the need for irrigation would decline an additional 20 percent over the following 10 years, freeing up 1,600 acre feet of water.

For the most appropriate estimation of value, we use the average annual income from irrigation water over the 5 years before the valuation date ($354,837) as a base price. Here, and in most of our calculations, we shall factor in a 3-percent inflation rate.[3] We then take into account the 2-percent expected annual decline in irrigation income that we estimated above, for a net inflation rate of 1 percent. In addition, all

---

[3]We do not factor in a 3-percent inflation rate for our valuation of the Corpus Christi transaction because the option agreement did not provide for an inflation increase to the base price of $450 per acre foot.

of the experts agreed that the base price should be discounted for the cost of capital.  Most agreed that 8 percent was an appropriate rate.[4]  We shall adopt the 8-percent discount rate. When the stream of projected irrigation income, increased by the net inflation rate of 1 percent, is discounted at an 8-percent rate, this results in a value of $3,742,062 for the irrigation component of petitioner's water right.

B.    Corpus Christi Component

Corpus Christi informed petitioner that it intended to exercise its option to purchase 35,000 acre feet of petitioner's water right in November 1996.  The amended option contract set the price for the water at $450 per acre foot, in addition to the $25,000 monthly payments until closing.  However, some uncertainty existed as to whether and when petitioner would obtain regulatory approval from the TNRCC for an interbasin transfer of 35,000 acre feet of water.  As a result of this uncertainty, it was unknown as of the valuation date when and if the transaction would be completed.

Respondent argues that regulatory approval by the TNRCC was foreseeable because in the end no farmers protested the

---

[4]For example, the 8-percent discount rate was derived by Mr. Scheig as follows:  In 1996-97, the yield on U.S. Treasury bonds, a risk-free investment, was 6.73 percent.  Increasing this figure an appropriate amount to account for the greater risk inherent in owning water rights instead of Treasury bonds, results in a cost of capital discount of 8 percent.

application, and the entities that did protest were not concerned about the harm to the basin, but rather were afraid the approval would lead to many future transfers.  We do not find respondent's argument persuasive because as of the valuation date, petitioner had not yet filed its application for approval of the Corpus Christi transaction.  The record shows that at that time, the LCRA and others intended to oppose the transfer to Corpus Christi, and petitioner could not predict whether its application would be approved.

Mr. Scheig assumed regulatory approval would be obtained 2 years after the valuation date and that petitioner would receive the monthly payments over this 2-year period, with the balance at closing.  He discounted that amount using an 8-percent cost of capital discount and a 15-percent lack of marketability discount, to reflect the restrictions in the regulatory approval process involved in transfers of petitioner's water.

Mr. Lloyd assumed regulatory approval would be obtained 3 years after the valuation date.  He discounted the total monthly payments made to that date by a 12-percent cost of capital.  He then discounted the balance due at closing ($13,810,000) by 30 percent, to reflect the rate of return a private equity buyer would require given the risks involved.

We recognize the regulatory risks and time delays that threatened the Corpus Christi transaction.  Mr. Scheig testified

that a sale within the basin would likely take about 6 months to complete, while a contested interbasin transfer could take 5 years. We believe that an estimate of 3 years is reasonable in predicting the closing date for the Corpus Christi transaction, especially given the intent of the 1997 legislature to deal with water rights.

The experts agreed that the expected payments petitioner would receive from the Corpus Christi transaction (both the monthly payments and the balance at closing) should be discounted. The monthly payments were contractually guaranteed to generate income for petitioner until the sale closed or the option agreement ended. We conclude above that it was foreseeable that the sale would be completed 3 years after the valuation date, which would require Corpus Christi to pay $25,000 per month for 36 months. The value of the monthly payments is $25,000 multiplied by 36 months, or $900,000. When this income stream is discounted using our 8-percent cost of capital discount, the value of the monthly payments is $773,129.

The payment of the balance at closing should be discounted by a higher rate than the cost of capital. We disagree with Mr. Lloyd's assertion that a buyer of water rights would require the same rate of return as a private equity or venture capital investor. The risk that regulatory hurdles would impede a sale of petitioner's water right is mitigated by the fact that

petitioner would still be able to sell water to others in the event that a transfer did not occur.  Although the changes the 1997 legislature would impose on the regulation of water in the Colorado River Basin were unforeseeable as of the valuation date, the regulatory and legislative risks affecting the Corpus Christi transaction were not so great as to require a 30-percent discount rate.  Given that petitioner had a buyer and a purchase price set before the valuation date, a 15-percent discount, as Mr. Scheig used, sufficiently factors in the regulatory and legislative risks.

After 3 years of monthly payments, plus the payments that were made before the valuation date, the balance due at closing of $450 per acre foot would be $13,810,000.  Discounted at 15 percent, the value of this closing payment is $9,080,299. Therefore, the total value of the Corpus Christi component, including the monthly payments, is $9,853,428.

C.    The Unused Water

After providing 100,000 acre feet of water to its irrigation customers and 35,000 acre feet to Corpus Christi, petitioner had the right to use 33,000 additional acre feet of water (the unused water) from the Colorado River.  In the several years leading up to the valuation date, the unused water flowed past petitioner's diversion point.  There was no evidence that petitioner's irrigation customers, the rice farmers, anticipated a need for

the unused water in the future; on the contrary, as we explained above, irrigation use was expected to decrease. The unused water was available to be sold or leased by petitioner at any time and had value as of the valuation date that must be included in our analysis. Respondent argues that it was foreseeable that the LCRA would be the most likely purchaser of petitioner's water right and that the LCRA would be willing to pay up to $600 million for the water because its alternative was to spend $600 million for a new reservoir. Respondent also argues that there was merely a remote chance that approval would not be obtained for a sale of the unused water because it was obvious that no harm would be caused by a transfer. Petitioner contends that because there were no active purchasers pursuing its water at the valuation date, there was no market at all for the unused water, and it was not foreseeable that it would be sold. We believe that at the valuation date, a reasonable prediction fell somewhere between the parties' respective positions.

Any sale or transfer of the unused water outside the Colorado River Basin or for nonirrigation use would face the same regulatory hurdles that were present in the Corpus Christi transaction. Any future sale of the unused water would also face legislative risk and would presumably be subject to any changes made by the 1997 legislature. In addition, because there were no active buyers for the unused water as of the valuation date, a

sale was more uncertain and would likely take place later than the Corpus Christi transaction. As we did in the Corpus Christi valuation, we must now determine the appropriate and foreseeable base price, time delay, and discount rate for a sale of the unused water.

In Mr. Lloyd's valuation of the unused water, he assumed a base price of $250 per acre foot of water based on the report of an engineering and valuation consultant estimating the price the LCRA could derive from a sale of petitioner's water right. He assumed that it would take 6 years to find a buyer for the unused water and obtain regulatory approval for a sale. He factored in 3-percent inflation and discounted the price by 40 percent to reflect private equity returns at the valuation date.

Mr. Scheig began with a base price of $600 per acre foot for the water right, based on two transactions from other basins near the Colorado River Basin. He applied a 15-percent discount for lack of marketability to the base price.

Mr. Camp used a base price of $783.39 per acre foot, derived from various adjustments made to a price of $105 charged by the LCRA to its customers. His base price took into account 3-percent inflation and a cost of capital of 8 percent. Mr. Camp then reduced the base price by 10 percent for the lack of a ready market in Texas for water contracts and 30 percent for regulatory risks.

We are not persuaded by the experts' analyses. Mr. Lloyd and Mr. Camp based their high discount rates on the premise that there were no potential buyers for the unused water as of the valuation date. The LCRA was a potential buyer. The LCRA's interest in petitioner's water right over the 30 years before the valuation date should be considered in valuing the unused water. Mr. Kowis, an employee of the TNRCC and its predecessor agencies for 27 years, testified that as of 1996, the LCRA was the most logical potential buyer for petitioner's water, and he was not surprised by the ultimate sale to the LCRA for $75 million. Mr. Rose, the general manager of the LCRA who negotiated with Mr. Lehrer, testified that discussions had halted because Mr. Lehrer was interested in selling only a portion of petitioner's water right, and the LCRA was interested in acquiring the entire water right. It is apparent that the actual sale that occurred was in part the result of Mr. Lehrer's change in position on this issue and in part the result of changes in the political landscape. The valuation of the unused water must take into account the potential for a purchase by the LCRA.

Mr. Scheig's use of transactions in the Rio Grande and other basins near the Colorado River Basin as comparables is flawed. At trial, Mr. Scheig admitted that the market conditions in the Rio Grande were very different from those in the Colorado River Basin. Unlike the uncertainty surrounding the conversion of

irrigation water to municipal water in the Colorado River Basin, the Rio Grande operated with a stable and predictable marketplace and regulatory umbrella. In addition, the market and regulatory conditions in petitioner's specific service area are key to the valuation of petitioner's water right. Mr. Scheig admitted that he did not examine the regulatory situation, transporting of water, or infrastructure of water districts involved in the transactions that occurred in the other basins near the Colorado River Basin.

The most reasonable approach to establishing a base price for the unused water is to examine comparable transactions. The only comparable transaction that occurred in petitioner's service area within the relevant time period was the Corpus Christi transaction. The sale to Corpus Christi was an arm's-length transaction, and the price was established through negotiations. When the price was agreed upon and when the option was exercised, the parties were aware of the regulatory requirements that would need to be fulfilled, as well as the legislative risks. Therefore, it is reasonable to use the price established by the parties to the Corpus Christi transaction, $450 per acre foot, as a base price for the unused water. We must now decide the appropriate discount rate to apply.

Several negative factors affected the market for the unused water. A buyer had not been identified, so a sale was less

certain than the Corpus Christi transaction. It was unknown what the 1997 legislature might do, and any resulting legislation could impede regulatory approval. Although the LCRA was a potential buyer for the unused water, it was possible that a sale would not occur. The interruptible nature of petitioner's water made it less saleable. This would be a major factor for any buyer and a municipality would need a backup supply of firm water for drought periods before it would buy an interruptible supply.

These negative factors, however, must be balanced against the possibility that petitioner would be able to sell or lease the unused water to an inbasin user or a politically powerful municipal user, which would eliminate much of the regulatory cost, legislative risk, and delay. Taking all these factors into account, we conclude that the base price of $450 per acre foot for the unused water should be discounted by 17 percent.

Finally, we must decide how long it might take for petitioner to sell the unused water. Petitioner would need to find a buyer, negotiate an agreement, and complete the regulatory process. The experts and other credible witnesses at trial estimated that the regulatory process alone could take from 1 to 5 years for an interbasin transfer, before factoring in any court proceedings. On the basis of the regulatory climate, it was reasonably foreseeable at the valuation date that any attempted transfer out of the basin would be opposed by the LCRA and other

inbasin users.  We consider a delay of 6 years to be reasonable for petitioner to complete a sale of the unused water.

We find that it is reasonably foreseeable that petitioner would sell 33,000 acre feet for $450 per acre foot (increased for inflation) 6 years after the valuation date, for a purchase price of $17,215,220.  Discounting the purchase price by 17 percent, the value of the unused water at the valuation date was $6,711,157.

D.  Potential Unused Water

As we discussed above, rice farming and the demand for irrigation water in Texas was expected to decline following the valuation date.  It was foreseeable that this decline would cause water formerly used for irrigation to become available for sale by petitioner for other uses.  The water that would become available as a result of the decrease in demand (the potential water) gives additional value to petitioner's water right.  We shall decide how much water was expected to become available, when it was foreseeable that the water would become available, and a reasonable discount rate.

Each expert used the same base price he had used for the unused water analysis.  Mr. Camp accounted for the potential water by assuming that as 5,000 acre feet of water became available, petitioner would apply for regulatory approval to change its use and attempt to sell it.  As we discussed above, he

predicted that 20 percent (20,000 acre feet) of petitioner's irrigation water would become available over the next 25 years. In addition to the cost of capital, he discounted the base price by 10 percent for uncertainty of the availability of petitioner's run-of-the-river water, 10 percent for lack of marketability, and 30 percent for regulatory risks.

Mr. Lloyd's report did not attribute any value to the potential water right. Mr. Scheig's report weighed the following three scenarios: (1) A .4-percent annual decline in irrigation use; (2) a 3-percent annual decline in irrigation use; and (3) a 100-percent decline in irrigation use and sale of all the irrigation water right within 10 years. Mr. Scheig discounted the base price by 15 percent.

We concluded above that 20 percent of the irrigation water would become available over 10 years, potentially for other uses. In valuing the potential water, however, it is unreasonable to assume that a sale of 2 percent per year was likely. It is unrealistic to predict that small increments would be sold as they became available. A municipal, industrial, or water supply purchaser would be unable to obtain funding (through a bond firm) to develop a conveyance system for a purchase of small quantities of water on an incremental basis. Our analysis therefore assumes that 20 percent of the irrigation water (20,000 acre feet) would be sold 10 years after the valuation date, and 20 percent of the

remaining irrigation water (16,000 acre feet) would be sold after another 10 years.

We use a base price of $450 per acre foot for the potential water, as we did for the unused water, taking into account inflation. The base price for the potential water should be discounted by a higher rate than that used for the unused water. It is only by speculation that we assume any of this water will become available. The regulatory, economic, and legislative uncertainty surrounding a future sale of the unused water is matched, and possibly exceeded, by the speculative nature of the potential water supply. Therefore, we conclude that a 20-percent discount is appropriate in valuing this water. This scenario would result in a payment 10 years after the valuation date of $11,742,959, and a payment 20 years after the valuation date of $12,625,244. Applying a discount rate of 20 percent, the value of the potential water on the valuation date was $2,225,871.

V.   Conclusion

We conclude that on January 1, 1997, the fair market values of the components of petitioner's water right were as follows:

| Irrigation | Corpus Christi | Unused | Potential | Total |
|---|---|---|---|---|
| $3,742,062 | $9,853,428 | $6,711,157 | $2,225,871 | $22,532,519 |

While this value is significantly less than the amount paid by the LCRA after the political climate settled favorably to petitioner's position as seller, such result simply was not

sufficiently predictable on January 1, 1997, to form the basis for a valuation.

<u>Decision will be entered under Rule 155</u>.